**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**HELENA DIVISION**

ROY MCNUTT                                                    **PLAINTIFF**

**V.**                            **2:03CV112 JMM**

**LOCAL 878 INT'L BROTHERS**
**OF TEAMSTERS, ET AL**                              **DEFENDANTS**

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Pending is Defendant Local 878 International Brothers of Teamsters's Motion for

Summary Judgment.  The Plaintiff has responded.  For the reasons set forth below, the Motion is

GRANTED.

I.      Facts

On August 6, 2003, Plaintiff filed his complaint pro se against both RBX Corporation and

Local 878 International Brothers of Teamsters's (hereinafter "Defendant" and "Local 878")

alleging a violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5 et seq. for

discrimination based on his race, African American, because of his termination as an employee of

RBX Corporation on February 10, 2003 and for breach of the duty of fair representation.

(Complaint, para. 1, 8, & 9).  Plaintiff filed a charge of discrimination against Local 878 on July

30, 2003 and received a notice of right to sue Local 878 from the EEOC dated August 6, 2003.

Plaintiff worked as a production employee for RBX Corporation at the company's Colt,

Arkansas manufacturing plant.  RBX manufactured rubber products at the Colt plant.  Plaintiff

was first hired on January 20, 1978 and worked continuously at the plant until his termination

from employment on February 10, 2003.  When Plaintiff was first hired, the Colt plant was owned

by Halstead Industries of Wynn, Arkansas.  In November 1994, Halstead Industries sold the plant

to Rubatex Corporation which subsequently changed its name to RBX Corporation (hereinafter

RBX).  RBX filed for bankruptcy on February 24, 2004, and closed its plant on or about April 2, 2004.  The Colt plant and equipment were auctioned off on May 21, 2004.

For many years, the production and maintenance employees at RBX were covered by a collective bargaining agreement ("CBA") negotiated between Local 878 and RBX.  The CBA established wages, hours, and other terms and conditions of employment for these employees.  Relevant articles and clauses of the CBA include the following:

Article 2 of the CBA states that the employer recognizes the union as the sole and exclusive bargaining agent for the purpose of collective bargaining with respect to rates of pay, wages, hours of employment and other conditions of employment relating only to the employees in the bargaining unit.  It further states that "The employer and Union agree that there will be no discrimination, interference, restraint or coercion by either party against employees because of membership or non-membership in the Union or because of race, color, creed, age, sex or national origin."

Article 3 of the CBA is the management rights clause.  (Ex. 3, p. 2-3).  The management rights clause states that except to the extent expressly abridged by specific provisions of the CBA, the employer solely and exclusively reserves and retains all of its rights to manage and operate its business.  (Art. 3, section 1, p. 2).  The enumerated rights retained by the company include the right to transfer, promote and demote, layoff, terminate or otherwise relieve employees from duty for lack of work or other reasons consistent with efficient operations; to discharge employees for just cause; to determine methods of work measurement and to establish standards of performance including the right to introduce new or improved production methods or facilities; and to do any other act or take any other measures which the Employer determines to be necessary for the

orderly, efficient and profitable operations of its business provided that this section will not be used to discriminate against the Union and its members and that this section will not in any way interfere with the employee's rights under the terms of the CBA.  (Ex.3, art. 3, sect. 2, p. 2).  In article 3, section 3 of the CBA, the union agrees that it will cooperate with the efforts of the employer to maintain or improve the efficiency and production of the employees and the quality of its products.

Article 11 of the CBA discusses plant rules, discipline and discharge of employees.  (Ex. 3, p. 16-17).  Article 11, section 4 of the CBA provides that an employee who has completed his or her probationary period may only be discharged for just cause and/or for violation of the plant rules.  Before discharge, one written warning must be given to the employee except for certain reasons not applicable to this case.  (Ex. 3, p. 17).  Article 11, section 5 provides that either the union or the employee may file a grievance as provided in article 12 of the CBA.

Article 12 of the CBA is the grievance procedure.  (Ex. 3, p. 17-19).  Article 12 provides for a number of progressive steps in processing a grievance with one step being arbitration of the grievance before the Piedmont Grievance Panel should either the union or the company decide to submit the grievance to the Piedmont Panel to obtain a decision on the grievance.

On August 9, 1999, Plaintiff became a rubber extrusion line operator.  Plaintiff was demoted from the line operator position by RBX to a packer within three months because RBX contended Plaintiff's job performance was poor.  (Ex. 1, para. 11).  Plaintiff filed a grievance dated November 1, 1999 protesting the demotion and requesting that he again be made a line operator.  (Ex. 4 & 5).  Carlton Collins processed his grievance to the Piedmont Grievance Panel.  (Ex. 6 & 7).  The panel issued a majority decision denying the grievance.  Under the terms of the

CBA, the union may not process the grievance beyond the Piedmont Grievance Panel level unless the panel deadlocks or is unable to issue a decision.  (Ex. 3, p. 18-19).

Carlton Collins, an assistant business agent of Local 878, represented Plaintiff on this grievance.  Collins is African American.

In approximately 2001, Plaintiff bid back into a line operator position.  On December 3, 2002, Plaintiff was given a first warning by RBX for creating excessive scrap.  (Ex. 1 & 8).  Plaintiff filed a grievance protesting this discipline on December 6, 2002.  (Ex. 9).  On January 28, 2003, Plaintiff received a second warning for creating excessive scrap.  (Ex. 1 & 10).

Henry Adams, African American chief union steward, called Carlton Collins informing him that a second warning for poor job performance was issued to Plaintiff.  Collins was out of town; but he called Tracy Webster, a human resources manager of RBX, and requested that the company take no action against Plaintiff until he had an opportunity to return and speak with him.  (Ex. 1, para. 13).  As an offer of settlement of the issue, Webster agreed to remove any warnings from Plaintiff's personnel file and to give him additional training provided he voluntarily agreed to step down from the line operator job.  (Pl.'s Dep. At p. 20).

On February 1, 2003, Collins and Adams visited Plaintiff at his home and tried to persuade him to give up the line operator position in order to save his job, but Plaintiff refused.  (Ex. 1 at para. 13).  On February 10, 2003, Plaintiff's employment was terminated after he received a third written warning for creating excessive scrap.  After Plaintiff's termination, Collins went to Stan McMorris, RBX plant manager, and asked him to return Plaintiff to work if Plaintiff would voluntarily remove himself from the line operator position.  McMorris agreed.  (Ex. 1 at para. 18).  Collins again visited Plaintiff at his home and discussed the company's offer

4

of reinstatement with him, but again Plaintiff refused to voluntarily go back to his previous job. (Pl.'s dep. At p. 16-18, 51-52). Collins told Plaintiff during the visit that he thought the union could not win the grievance in arbitration. (Pl's dep. at p. 57). Plaintiff offered to temporarily step down from the line operator position until his grievance could be heard by the Piedmont Grievance Committee, but RBX would not agree to this.

A grievance hearing was held between Local 878 and RBX on March 7, 2003 to discuss both the December 6, 2002 and the February 13, 2002 grievances. Before the hearing, Collins interviewed Plaintiff's co-workers including Obertis Hall (African American) who was one of the best line operators and was involved in training Plaintiff for the line operator position. Hall told Collins that Plaintiff was uncooperative in training and would not listen to Hall's instructions. Collins spoke to Plaintiff's general foreman. The foreman told Collins that on December 3, 2002 the line was running well and good quality rubber was coming off the line. The foreman advised Plaintiff not to change any of the settings on the machinery since the line was running well. The foreman said he later returned to the line and found Plaintiff had changed the machine settings. As a consequence, the line was now making excessive scrap. (Ex. 1 at para. 19).

Collins was also aware that Plaintiff was claiming other line operators were not disciplined for creating excessive scrap. Collins investigated this issue but found no evidence to support the allegation. (EX. 1 at para. 19). Collins learned that two white female employees Plaintiff complained of as receiving more favorable treatment than him, Jeanette Landry and Kathy Lawrence, worked as versa cutter operators which feed the raw rubber product at the beginning of the line so they were not in a position comparable to Plaintiff who was able to determine the outcome of the final product. (Ex. 1 at para. 19). Additionally, Collins learned

5

that RBX sent all of the line operators for training and everyone completed the training except Plaintiff.  Id.

Collins' notes from the March 7, 2003 grievance meeting reflect that RBX figures showed that on January 24, 2003, Plaintiff extruded 1200 pounds of rubber of which 900 pounds were scrap.  On January 27, 2003, he extruded 223 pounds of rubber of which 94 pounds were scrap. On January 28, 2003, he extruded 544 pounds of rubber of which 398 pounds were scrap.  On February 5, 2003, Plaintiff extruded 691 pounds of rubber of which 307 pounds were scrap.  On February 7, 2003, he extruded 246 pounds of rubber all of which were scrap.  (Ex. 1 at para 20 and Ex. 12).

The March 7, 2003 grievance hearing was attended by Plaintiff, Adams, Kathy Baxter and Collins (all African Americans) for the union's side.  During the hearing an issue was raised of whether Plaintiff was being blamed for the excessive scrap created by other line workers.  This issue was investigated during the grievance hearing, and it was determined that this was not the case.  Plaintiff, Adams, and Baxter were given an opportunity to present any information or concerns they may have about Plaintiff's treatment.  Plaintiff did state during the hearing that he was a victim of discrimination, but gave no specific information.  (Ex. 1 at para. 21).

On March 17, 2003, RBX issued a letter to the union denying the grievance.  (Ex. 15). After receiving a copy of RBX's answer denying the grievance, Collins researched the issues and made a decision that Plaintiff's two grievances were without merit.  Collins did not process the grievances further to the Piedmont Grievance Committee.  He sent a letter to Plaintiff dated April 10, 2003 advising him that he would not process Plaintiff's grievances any further.  Collins explained in his letter that it was his opinion that RBX correctly followed progressive discipline

proceedings in terminating his employment.  (Ex. 16).  Collins, acting alone, made the decision

on behalf of Local 878 not to take Plaintiff's grievance to the Piedmont grievance Panel.  (Ex. 1 at

para. 26).

After receiving the letter from Collins dated April 10, 2003, Plaintiff filed an unfair labor

practice charge with the National Labor Relations Board ("NLRB") contending that Local 878

failed to represent him in processing his grievances.  (Ex. 17).  On June 10, 2003, the NLRB

issued a letter dismissing the NLRB charge for lack of merit.  (Ex. 18).  Plaintiff appealed this

initial determination, but it was upheld by the NLRB's Office of the General Counsel by letter

dated October 8, 2003.  (Exs. 19 and 20).

II.    Discussion of the Law

A.  Standard for Summary Judgment

Summary judgment is appropriate only when there is no genuine issue of material fact, so

that the dispute may be decided solely on legal grounds.  *Holloway v. Lockhart*, 813 F.2d 874 (8th

Cir. 1987);  Fed. R. Civ. P. 56.  The Supreme Court has established guidelines to assist trial

courts in determining whether this standard has been met:

> The inquiry is the threshold inquiry of determining whether there is
> a need for trial -- whether, in other words, there are genuine factual
> issues that properly can be resolved only by a finder of fact because
> they may reasonably be resolved in favor of either party.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

The Eighth Circuit Court of Appeals has cautioned that summary judgment should be

invoked carefully so that no person will be improperly deprived of a trial of disputed factual

issues.  *Inland Oil & Transport Co. v. United States*, 600 F.2d 725 (8th Cir. 1979), *cert. denied*,

444 U.S. 991 (1979).  The Eighth Circuit set out the burden of the parties in connection with a

summary judgment motion in *Counts v. M.K. Ferguson Co.*, 862 F.2d 1338 (8th Cir. 1988):

> [T]he burden on the moving party for summary judgment is only to
> demonstrate, *i.e.*, '[to] point out to the District Court,' that the
> record does not disclose a genuine dispute on a material fact.  It is
> enough for the movant to bring up the fact that the record does not
> contain such an issue and to identify that part of the record which
> bears out his assertion.  Once this is done, his burden is discharged,
> and, if the record in fact bears out the claim that no genuine dispute
> exists on any material fact, it is then the respondent's burden to set
> forth affirmative evidence, specific facts, showing that there is a
> genuine dispute on that issue.  If the respondent fails to carry that
> burden, summary judgment should be granted.

*Id.* at 1339. (quoting *City of Mt. Pleasant v. Associated Elec. Coop.*, 838 F.2d 268, 273-274 (8th

Cir. 1988) (citations omitted)(brackets in original)).  Only disputes over facts that may affect the

outcome of the suit under governing law will properly preclude the entry of summary judgment.

*Anderson*, 477 U.S. at 248.

B.  Title VII

42 U.S.C. § 2000-e(c) prohibits a labor organization from discriminating against any

individual because of his race.  Plaintiff claims the reason Carlton Collins of Local 878 decided

not to appeal his grievance was based upon Plaintiff's race not the merits of his case.  Plaintiff has

the burden of proving that he was treated less favorably than similarly situated white employees.

Absent such proof, the union need only articulate a legitimate reason for its actions. Unions are

not required to pursue unmeritorious grievances. *Vaca v. Sipes*, 386 U.S. 171, 87 S.Ct. 903, 17

L.Ed.2d 842 (1967).

After review of the entire record, the Court finds that Plaintiff has failed to provide any

evidence that the union was motivated by racial considerations in refusing to appeal his grievance

or that he was treated differently by Local 878 than any similarly situated white employee.  In

fact, the evidence shows that Collins went out of his way to protect Plaintiff's employment with RBX on several occasions. Collins negotiated with RBX to have all negative appraisals in Plaintiff's personnel file removed if Plaintiff would step down to a different position where he could receive further training. Plaintiff refused. Collins investigated all of Plaintiff's allegations about being blamed for co-workers' mistakes. Collins represented Plaintiff at the March 7, 2003 grievance hearing. Collins even contacted RBX's plant manager after Plaintiff's termination to try to get Plaintiff's job back. Furthermore, Carlton Collins is African American. There is absolutely no evidence that Plaintiff was a victim of racial discrimination by Local 878.

Plaintiff also alleges that Local 878 breached its duty of fair representation in violation of Title VII. "[T]he exclusive agent's statutory authority to represent all members of a designated unit includes a statutory obligation to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct. *Vaca v. Sipes,* 386 U.S. at 177 (citing *Humphrey v. Moore*, 375 U.S. 335, 342, 84 S.Ct. 363, 367, 11 L.Ed.2d 370 (1964)). Again, the Court finds that Plaintiff has failed to present any evidence, direct or circumstantial, of discrimination by Local 878. Therefore, the McDonnell Douglas burden shifting analysis is used to analyze Plaintiff's claim.

Assuming Plaintiff has set forth a prima facie case of discrimination, Plaintiff must prove that Collins' reason for refusing to process Plaintiff's grievances to the Piedmont Grievance Committee was a pretext to hide discrimination. The Defendant states that the union's refusal to appeal Plaintiff's grievances was based on Collins' determination that Plaintiff's grievances were without merit and that RBX had followed procedures detailed in the CBA correctly.

In order to prove pretext, Plaintiff could present evidence that black employees with

grievances were treated differently than white employees with similar grievances or that Plaintiff's grievances were meritorious. Plaintiff has presented no such evidence. The only evidence presented in the case points to the fact that Plaintiff was having difficulty performing his job as line operator. He was warned by RBX and given opportunities to either correct his deficiencies or to take other jobs in the plant. There is testimony from a co-worker and trainer, Obertis Hall, that Plaintiff was uncooperative in his training as a line operator. There is also testimony from Plaintiff's supervisor that Plaintiff disregarded his directions to leave the machine settings in place and this led to production deficiencies. Further, there is evidence that Plaintiff failed to complete his training as line operator while all of the other employees who were given the training completed it. In other words, the evidence is overwhelming that Plaintiff's grievances regarding RBX's disciplinary actions and Plaintiff's subsequent termination are without merit and the Defendant is not required to pursue such grievances.

In conclusion, Plaintiff has failed to present evidence that Local 878's stated reason for refusal to process his grievances was merely a pretext for discrimination. Plaintiff has failed to provide any evidence of discrimination by the Defendant and has failed to prove that the Defendant breached its duty of fair representation. Therefore, Defendant's Motion for Summary Judgment (Docket # 54) is GRANTED.

The Clerk is directed to close the case as to Defendant Teamsters Local Union No. 878. The Court has been notified that the bankruptcy proceedings of Defendant RBX Corporation are ongoing. Therefore, the Clerk is directed to administratively close the case at this time as to RBX. Defendant RBX is directed to notify the Court within thirty (30) days of the close of these bankruptcy proceedings. Accordingly, the trial date of December 18, 2006 is cancelled.

10

IT IS SO ORDERED this 15th day of November 2006.

James M. Moody
United States District Judge